DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} This case involves the legal custody of a young boy who was removed from his mother's care due to concerns about violence in the home his mother shared with her boyfriend. T.P. was adjudicated dependent and neglected along with two of his half-brothers. Summit County Children Services Board obtained temporary custody and placed T.P. in his father's home. He remained there for over a year, living with his father, step-mother, and two older half-siblings. He adjusted well to that situation and improved academically. During that time, T.P.'s mother made some progress on her case plan, but the initial *Page 2 
concerns with her living arrangements remained unchanged. A magistrate later held a dispositional hearing and awarded legal custody to T.P.'s father. The mother timely filed objections to that decision. The trial court overruled those objections and granted the motion for legal custody to T.P.'s father. The mother has appealed from that judgment. The central issue on appeal is whether it was in T.P.'s best interest to be placed in the legal custody of his father, rather than that of his mother. Upon consideration, this Court concludes that the trial court properly found that legal custody to the father was in the child's best interest.
 FACTS {¶ 2} The Summit County Children Services Board became involved with this family when Diane P. was going through a contentious divorce from the father of her youngest son. At that time, Diane was living with her three sons in the home of her boyfriend, Robert D. The agency filed neglect and dependency complaints for all three boys after the youngest boy's father took him to the hospital for treatment of an unexplained burn on his hand, as well as a black eye and a mark on his nose.
 {¶ 3} The agency expressed concerns at that time regarding Diane's living situation. The agency received reports from Diane's family members, including two of her sons, that her boyfriend was violent and had injured her on more than one occasion. All three boys were adjudicated neglected and dependent and placed in the temporary custody of Children Services. Eventually, the trial court *Page 3 
awarded legal custody of both of T.P.'s half-brothers to their respective fathers while T.P. remained in the agency's temporary custody.
 {¶ 4} T.P. was seven years old when he was removed from his mother's care. Although he had been visiting with his father and step-mother in recent years, they had had no involvement in his life until he was nearly five years old. When Children Services removed T.P. from his mother's home, he went to live with his father. For over a year, during the pendency of this case, T.P. lived in his father's home with his father, his step-mother, and an older half-brother and half-sister. At the end of that year, Children Services moved the court for legal custody for T.P.'s father. The mother moved for legal custody as well. A magistrate held an evidentiary hearing on both motions.
 {¶ 5} At the hearing, various witnesses testified, including two guardians ad litem, a Children Services caseworker, T.P.'s father, and T.P.'s step-mother. The first guardian ad litem to testify was Gina D'Aurelio. She had worked with T.P. for the entire year that Children Services had been involved in his case. Ms. D'Aurelio testified that she had observed T.P. visiting with his mother on approximately eight or nine occasions. On each occasion, Diane was appropriate and affectionate with T.P. She brought him snacks and played age-appropriate games with him. Ms. D'Aurelio testified that Diane "has a great relationship with [T.P.]" and he "loves her very much." *Page 4 
 {¶ 6} Ms. D'Aurelio expressed concerns, however, about Diane's live-in boyfriend, Robert D. Diane's family members had reported Robert had a violent nature and a history of physically abusing Diane. Both Ms. D'Aurelio and the Children Services caseworker testified that, in July of 2005, Diane briefly moved out of Robert's home after a fight that left Diane with visible injuries. The caseworker testified that both Diane and her mother called to discuss this incident of domestic violence prior to a scheduled visit Diane was to have with her sons. Both Ms. D'Aurelio and the caseworker testified that, on the day of the visit, they saw an egg-sized, dark-colored knot on Diane's forehead, which she attempted to cover with a hat. Ms. D'Aurelio testified that T.P. also saw his mother's injuries and was upset and crying during their visit.
 {¶ 7} Within six weeks of that incident, T.P.'s half-brothers reported that Diane had moved back in with Robert and had told them that they would all live there together when the case was over. In the face of questions from the guardian ad litem and Children Services workers, however, Diane denied that she had moved back into Robert's house. Finally, in the fall of 2005, at the semi-annual review meeting, workers again asked Diane whether she had moved back in with Robert. According to Ms. D'Aurelio, Diane became "very irate" and began "screaming it's none of anyone's f ing business and she doesn't have to answer that question. . . ." She later admitted that she had, in fact, moved back into Robert's house. *Page 5 
 {¶ 8} The caseworker testified that, in the fall of 2005, she went to the home that Diane and Robert shared in order to urge Robert's participation in Diane's case plan. She testified that Robert "was very, very hostile and irate, cursing at [her], telling [her] that he was not going to work [on] any case plan. . . ." The caseworker testified that she feared for her life. She also testified that Diane was present during this incident and supported Robert's position. The caseworker testified that Robert "is a very violent, hostile man" and that she is afraid of him. She never felt it was safe for her to return to Robert's house.
 {¶ 9} The Children Services caseworker also expressed concern about Diane's "erratic and violent behaviors." In addition to the incident discussed above when Diane became upset at the semi-annual review, the testimony revealed two other incidents of Diane's explosive behavior. One of these incidents occurred early in the case when the Children Services caseworker told Diane that Robert's kids could not accompany her to the visitation center for visits with her sons. That incident was witnessed by her children. The other occurred in the fall of 2005, shortly after the trial court had awarded legal custody of Diane's other two sons to their respective fathers. On that occasion, while visiting with T.P. at the visitation center, Diane became very angry at the Children Services worker. "[Diane] started yelling and screaming that she's not going to be here next week" to visit with her son. T.P. was visibly upset and began crying at his mother's outburst. *Page 6 
 {¶ 10} Despite Diane's threat to stop visiting with T.P., she has consistently exercised her right to visitation throughout the course of this case. As part of her case plan, Diane completed a drug and alcohol evaluation and submitted random drug screens, all of which were negative. Diane also completed an anger management course as required by her case plan. The evidence revealed, however, that her explosive behavior continued long after she completed that course. Although Children Services never made individual counseling a part of her case plan, it had strongly recommended she pursue a mental health evaluation. Diane, however, remained firmly resistant to individual counseling.
 {¶ 11} The main concern expressed at the hearing was that Diane had not remedied her living situation. Ms. D'Aurelio testified that, in her opinion, Robert "is very violent [and] controlling" and Diane "does not have the ability . . . to stand up to him and do what is in the best interest of her kids." The Children Services case worker testified that Diane had a history of obeying the dictates of her boyfriend and was not able to protect herself or her children from him. The testimony revealed that Diane had lived with her father for a short time following the July 2005 incident of domestic violence with Robert. The testimony also revealed that Diane's sister had purchased a house for Diane to use, rent free, so that she could live on her own. Diane declined, however, choosing instead to continue living with Robert. *Page 7 
 {¶ 12} The case worker recommended that T.P.'s father be awarded legal custody. The worker pointed out that T.P. had adjusted well to his new living situation. He had been behind academically when he was first placed with his father, but, since that time, had become an honor student. The father was able to offer T.P. a clean, stable home where a parent was always present. He also demonstrated a stable employment history and the financial ability and willingness to support T.P. until he reaches adulthood. T.P.'s step-mother testified that, before Children Services became involved with Diane, they would often find that T.P. was dirty and smelled of urine when they would pick him up for visits. He would sometimes need a bath and clean clothes before the family could go out in public. She testified that T.P. has a tendency to be shy and introverted. It took some time, but T.P. eventually opened up in their home and now seems relaxed and happy. T.P. does still tend to be quiet and withdrawn, however, on the days that he visits with his mother or his maternal aunt. He has also consistently wet the bed, but only on the nights after he has visited with his mother or his mother's family. His step-mother also testified that he had been doing very well in school since he came to live with them. T.P.'s step-mother testified that she and her husband are committed to raising T.P. to adulthood.
 {¶ 13} The Children Services worker and the guardians ad litem all agreed that there had been an ongoing concern that T.P.'s father was not taking T.P. to see his counselor. Children Services had recommended counseling for T.P., but *Page 8 
his father had taken him to very few sessions, citing scheduling conflicts. Everyone agreed that T.P. would benefit from psychological counseling. T.P.'s step-mother testified that she had discussed the matter with her husband and that they had agreed that counseling was in T.P.'s best interest and must be pursued. Just before the hearing, they had taken T.P. to his first session in months, but testified that they were committed to providing T.P. with whatever psychological help he may need. Everyone expressed confidence that T.P. would receive psychological counseling if left in his father's care.
 {¶ 14} T.P.'s mother argued that she had a stronger relationship with T.P. and it was in T.P.'s best interest to live with her, pointing out that she had made considerable progress on her case plan. T.P.'s own attorney also urged the court to award legal custody to Diane, based upon T.P.'s desire to live with his mother. T.P. had expressed that same desire during an in camera interview with the magistrate. Although T.P. was extremely reluctant to talk to the magistrate, he did say that he liked living with his father, but wanted to live with his mother.
 {¶ 15} The second guardian ad litem, Deanna Sinn, had only been assigned to the case a few weeks before the hearing. She had not had an opportunity to interview the mother or see her interact with her son, but did offer testimony regarding her trip to the father's house and her impression of T.P.'s living situation. She recommended legal custody for the father. She testified that his father's house was very nice and she had no concerns about T.P. living there. She *Page 9 
also testified that T.P. had reportedly told his teacher that he would like to live with his father during the week and with his mother on weekends. Ms. Sinn testified that T.P.'s stated desire to live with his mother was not necessarily a reflection of his feelings about living with his father.
 {¶ 16} The Children Services caseworker also recommended that the court grant legal custody to the father. She based that recommendation on the fact that the mother had failed to remove herself from the violent relationship that caused the agency's initial concern regarding her ability to protect herself and her children. The case worker also echoed the guardian ad litem's thoughts about how T.P. had flourished while in his father's home.
 {¶ 17} Following the hearing, the magistrate awarded legal custody to the father. The trial court overruled the mother's objections to that decision and awarded the father legal custody. The mother has appealed that ruling, arguing that the trial court incorrectly placed T.P. in the legal custody of his father and that the trial court should have returned T.P. to her custody.
 BEST INTEREST OF THE CHILD {¶ 18} "Although the statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, this Court has previously indicated that the trial court must base such a decision on the best interest of the child." In re S.N., 9th Dist. No. 23571,2007-Ohio-2196, at ¶ 27 (citing In re S.J., 9th Dist. No. 23199,2006-Ohio-6381, at ¶ 32). While a parent's compliance with *Page 10 
a case plan is relevant to the determination of what disposition is in a child's best interest, it is not dispositive of that question. In reM.G., 9th Dist. No. 07CA009158, 2007-Ohio-6398, at ¶ 11. The primary issue is whether it was in T.P.'s best interest to live with his father rather than his mother.
 {¶ 19} The evidence demonstrated that Diane was not in a position to provide a suitable home for her son. T.P. had a good relationship with his mother, who had raised him since birth. Prior to the beginning of this case, however, T.P.'s mother had not always kept T.P. clean and given him clean clothes to wear. Since the beginning of this case, Diane has consistently visited with T.P. and has always been appropriate in her interactions with him. She has not always been appropriate, however, in her interactions with Children Services personnel and others involved in this case. Despite making progress on her case plan, Diane's erratic, angry outbursts continued. Agency workers testified that one such outburst occurred in front of T.P. and visibly upset him. Despite the pleas of the Children Services worker, Diane has remained resistant to pursuing psychological evaluation and treatment for herself. Furthermore, Diane has been living in an ongoing relationship with a controlling, violent man who reportedly has a history of physically harming her. Children Services personnel saw Diane's injuries from one such incident. Diane has had alternative living arrangements open to her, but has chosen instead to continue living in a dangerous, volatile household. *Page 11 
 {¶ 20} On the other hand, T.P.'s father and step-mother testified that they are willing and able to raise T.P. to adulthood in a stable family environment. There have been no allegations of violence involving the father's family. The father testified that he and his family have been living in the same house for three years and he has a stable income sufficient to provide for T.P. Furthermore, someone is always able to be home with the children. By all accounts, T.P. has adjusted well to living with his father, step-mother, and older half-siblings. T.P. has gone from being behind in his studies to being an honor student. And his normally shy demeanor has become more relaxed and open in his new home. T.P. loves his mother and he misses her. T.P. has clearly stated that he would like to live with his mother. He also, however, indicated that he likes living with his father and step-mother.
 {¶ 21} Diane has made considerable progress on her case plan, but the original concerns for T.P.'s safety have not been addressed. Diane has continued to ignore other options for living arrangements that would not subject T.P. to her volatile romantic relationship. She has also continued to display the same erratic, violent behavior that caused concern early in the case. The trial court had ample evidence before it from which it could conclude that it was in T.P.'s best interest to be placed in the legal custody of his father, rather than his mother. Diane's assignment of error is overruled. *Page 12 
 CONCLUSION {¶ 22} The mother's sole assignment of error is overruled because there was ample evidence from which the trial court could conclude that it was in T.P.'s best interest to be placed in the legal custody of his father. The judgment of the Summit County Court of Common Pleas, Juvenile Division, granting legal custody of T.P. to his father, is affirmed.
Judgment affirmed. The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 SLABY, P. J., WHITMORE, J. CONCUR *Page 1